Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL X

| | | |
|---|---|---|
| ALEXIS FERNANDO NIEVES VIERA<br><br>*Recurrido*<br><br>v.<br><br>PATHEON PUERTO RICO, INC. H/N/C THERMO FISHER SCIENTIFIC<br><br>*Peticionaria* | KLCE202301248 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala Superior de Caguas<br><br>Civil Núm.: MT2022CV00503<br><br>Sobre: Despido Injustificado y Represalias |

Panel integrado por su presidenta; la Juez Lebrón Nieves, la Juez Barresi Ramos y la Jueza Santiago Calderón

Santiago Calderón, Jueza Ponente

**RESOLUCIÓN**

En San Juan, Puerto Rico, a 2 de febrero de 2024.

Comparece Patheon Puerto Rico, Inc. h/n/c Thermo Fisher (Patheon o peticionaria) mediante recurso de *Certiorari* y nos solicita la revisión de la *Orden* emitida el 23 de octubre de 2023, notificada el 30 de octubre de 2023, por el Tribunal de Primera Instancia, Sala Superior de Caguas (TPI o foro primario). Mediante el aludido dictamen, el TPI denegó la *Moción de Sentencia Sumaria* presentada por Patheon.

Por los fundamentos que expresamos a continuación, **denegamos** la expedición del auto de *Certiorari* solicitado.

**I.**

El 7 de julio de 2022, el señor Alexis Fernando Nieves Viera (señor Nieves Viera o recurrido) presentó una *Querella*[1] contra Patheon al amparo del procedimiento sumario dispuesto por la Ley Núm. 2 del 17 de octubre de 1961, según enmendada, conocida como la *Ley de Procedimiento Sumario de Reclamaciones Laborales*,

---

[1] Apéndice del recurso, págs. 1-5.

Número Identificador
RES2024_____

32 LPRA sec. 3118, *et seq.* (Ley Núm. 2). En esencia, el recurrido alegó que trabajó para Patheon desde octubre de 2009 hasta el 27 de mayo de 2022, fecha en que presuntamente fue despedido. El recurrido adujo que la peticionaria tomó varias acciones en su contra por motivo de su edad y en represalia por sus quejas acerca de los términos y condiciones de trabajo, productos de la compañía, así como la radicación de un cargo de discrimen ante la Equal Employment Opportunity Commision (EEOC) y la Unidad Antidiscrimen (UAD).

El 19 de agosto de 2022, Patheon presentó su *Contestación a Querella*[2] en la que negó la mayoría de las alegaciones en su contra y presentó varias defensas afirmativas. Arguyó que el señor Nieves Viera fue despedido por justa causa debido a que éste incurrió en "un patrón de conducta grave, impropia y desordenada, actos deshonestos y violaciones reiteradas a las normas y políticas de la compañía y fue objeto de disciplina progresiva pero no mejoró"[3].

Posteriormente, el 30 de mayo de 2023, Patheon presentó una *Moción de Sentencia Sumaria*[4]. En síntesis, propuso ochenta y dos (82) hechos incontrovertidos por los que, a su juicio, procedía que se dictara sentencia sumaria a su favor. Por otro lado, alegó que el señor Nieves Viera incurrió en un patrón de desempeño deficiente e ineficiente y violentó reiteradamente las normas y políticas de la compañía. En particular, señaló que el recurrido incurrió en faltas graves al manipular una prueba regulada de un medicamento para el consumo humano y proveer información falsa a Patheon durante el proceso investigativo. Patheon añadió que el recurrido recibió disciplina correctiva y progresiva previo a su despido, incluyendo una advertencia final en la que se le informó que de continuar con

---

[2] Apéndice del recurso, págs. 6-20.
[3] Apéndice del recurso, pág. 14.
[4] Apéndice del recurso, pág. 21-927.

sus incumplimientos sería despedido. Sin embargo, adujo que el recurrido incurrió en faltas graves, por lo que procedía su despido. Patheon acompañó su moción con varios documentos; entre estos, una declaración jurada de la señora Chayla E. Meléndez Morales, transcripción de deposición del señor Nieves Viera tomada el 2 de marzo de 2023, documento intitulado *Human Resources Investigation Report.*

Por su parte, el 18 de agosto de 2023, el señor Nieves Viera compareció mediante *Oposición del Querellante a la relación concisa y organizada de hechos materiales que no están en controversia de la Moción de Sentencia Sumaria*[5]. El recurrido admitió varios hechos propuestos por Patheon en su solicitud de sentencia sumaria. No obstante, alegó que algunos hechos no debían ser considerados por estar sustentados con prueba de referencia inadmisible en evidencia. Además, el recurrido desistió voluntariamente de su causa de acción de discrimen por razón de edad bajo la Ley Núm. 100 de 30 de junio de 1959, según enmendada, conocida como *Ley contra el Discrimen en el Empleo,* 29 LPRA sec. 146 *et seq.* (Ley Núm. 100).

Así las cosas, el 23 de octubre de 2023, notificada el 30 de octubre de 2023, el TPI emitió la *Orden*[6] recurrida en la que denegó la *Moción de Sentencia Sumaria* presentada por Patheon. En la misma, dispuso lo siguiente:

> EVALUADA LA "MOCIÓN DE SENTENCIA SUMARIA" Y EL ESCRITO EN OPOSICIÓN PRESENTADO POR LA PARTE QUERELLANTE EL TRIBUNAL DETERMINA QUE LOS SIGUIENTES HECHOS DE LA SOLICITUD DE SENTENCIA SUMARIA NO ESTÁN EN CONTROVERSIA: 1-30, 35-37, 39, 42, 63, 64, 69 Y 72-82. QUEDANDO EN CONTROVERSIA LOS HECHOS RESTANTES EL TRIBUNAL DECLARA NO HA LUGAR LA SOLICITUD DE SENTENCIA SUMARIA.
>
> SE SEÑALA UNA CONFERENCIA DE STATUS PARA EL 15 DE NOVIEMBRE DE 2023 A LAS 9AM MEDIANTE VIDEOCONFERENCIA.

---

[5] Apéndice del recurso, págs. 943-1025.
[6] Apéndice del recurso, pág. 1107.

Particularmente, el TPI determinó que los siguientes hechos están en controversia:

[…]

34. Como parte de las acciones disciplinarias impartidas al querellante se le proveyeron pasos específicos para mejorar su comportamiento y se le apercibió que, de incurrir en violaciones adicionales, podría tener sanciones mayores incluyendo la separación de su empleo permanentemente. **Exhibit 3 del Anejo 1**, *Acciones disciplinarias impartidas al querellante.*

[…]

38. Un resultado "AS" en la evaluación de desempeño refleja que el empleado cumple con las expectativas de su trabajo para el periodo evaluado. **Anejo 1**, *Declaración Jurada de Chayla Meléndez*, ¶ 26.

[…]

40. La prueba LOD requiere, entre otras cosas, que se muelan cinco tabletas del producto utilizando el mortero, se pase el polvo por el horno y se pese la muestra. **Anejo 2**, *Deposición de Alexis Nieves Viera*, pág. 119, l. 4 a la pág. 120, l. 12; **Exhibit 7 del Anejo 3**, MFG061.

41. Mediante la prueba de LOD, se persigue determinar el peso de la muestra después de pasar el polvo de la tableta por el horno y haberse secado, lo que requiere un cálculo matemático. Como parte del cálculo se requiere tomar en consideración el peso de la prueba antes y después de haber estado en el horno y haberse secado. Además, de acuerdo con el método, los resultados de la prueba de "LOD" no deben ser negativos. **Exhibit 7 del Anejo 3**, *MFG-061, a las págs. 4 y 36*; **Anejo 1**, *Declaración Jurada de Chayla Meléndez*, ¶ 30; **Exhibit 8 del Anejo 3**, *Laboratory Investigation Report 200922.*

[…]

43. El 27 de octubre de 2021, el querellante realizó pruebas de LOD, para tres (3) lotes que arrojaron resultados atípicos. **Anejo 2**, *Deposición de Alexis Nieves Viera,* pág. 88, l. 12 a la pág. 89, l. 10.

44. Durante su deposición, el querellante declaró que la prueba de LOD requiere limpiar la pesa con un kimwipe, que es como un kleenex, antes de colocar la muestra. Anejo 2, Deposición de Alexis Nieves Viera, pág. 91, l. 7-17 y pág. 277, l. 20 a la pág. 278, l. 12. El proceso de limpiar la pesa se tiene que realizar utilizando guantes y el SOP no establece excepción. **Anejo 2**, *Deposición de Alexis Nieves Viera*, pág. 92, l. 23 a la pág. 93, l. 12. No obstante, el querellante no utilizó guantes mientras realizó la prueba de LOD ni acomodó la muestra. **Anejo 2**, *Deposición de Alexis Nieves Viera,* pág. 273, l. 24 a la pág. 274, l. 4 y pág. 276, l. 4-17.

45. Aunque se supone que siempre se limpie la pesa antes de colocar la muestra, Nieves admitió durante su deposición que el 27 de octubre de 2021 no limpió la pesa antes de poner la muestra, sino que cogió un papel y limpió la balanza con la muestra ya colocada. **Anejo 2**, *Deposición de Alexis Nieves Viera,* pág. 91, l. 7 a la pág. 93, l. 3.

46. El querellante también tenía que utilizar guantes durante las pruebas de LOD para protegerse durante el proceso y evitar la contaminación de la muestra. **Anejo 2**, *Deposición de Alexis Nieves Viera*, pág. 271, l. 4-10; **Anejo 1**, *Declaración Jurada de Chayla Meléndez*, ¶ 32. Durante su deposición, el querellante admitió que, el 27 de octubre de 2021, cuando colocó las muestras no utilizó guantes. **Anejo 2**, *Deposición de Alexis Nieves Viera*, pág. 273, l. 17 a la pág. 276, l. 17.

47. El 27 de octubre de 2021, el querellante también llevó un abanico al laboratorio en donde estaba realizando la prueba, sin solicitar autorización. **Anejo 2**, *Deposición de Alexis Nieves Viera*, pág. 258, l. 13-21.

48. Durante su deposición, el querellante declaró que, el 27 de octubre de 2021, no reportó que la balanza en la que estaba haciendo la prueba de LOD estuviera dando problemas y que continuó con el proceso. **Anejo 2**, *Deposición de Alexis Nieves Viera*, pág. 93, l. 13 a la pág. 94, l. 7 y pág. 102, l. 1-14.

49. Los cálculos de una de las pruebas de LOD realizada por el querellante el 27 de octubre de 2021, arrojaron un resultado de "% LOD = -0.052" y otras 0, los cuáles son resultados atípicos. **Anejo 2**, *Deposición de Alexis Nieves Viera*, pág. 152, l. 14 a la pág. 153, l. 18; Anejo 8, Cálculos realizados por el querellante el 27 de octubre de 2021. G. Investigaciones realizadas por Patheon

50. Ante los resultados atípicos de las pruebas de LOD del 27 de octubre de 2021, el Departamento de QC de la Compañía comenzó una investigación para determinar qué causó dichos resultados. Como parte de la investigación, el 28 de octubre de 2021, la Compañía entrevistó al querellante sobre el proceso realizado y surgió lo siguiente:

> On 28-Oct-2021, the QC Scientist (00216798) was interviewed by QC Supervisor (00215731). During the interview the QC Scientist (00216798) mentioned that he had performed the LOD test according to Method MFG-061, Rev. 03. QC Scientist (00216798) also mentioned that the balance (Bal 27) was unstable and that it took too much time to obtain the tare and stabilize the balance.

**Anejo 1**, *Declaración Jurada Chayla Meléndez*, ¶ 33; **Exhibit 8 del Anejo 3**, *Laboratory Investigation Report 200922, a la pág. 5.*

51. Durante la investigación relacionada a los resultados atípicos de las pruebas de LOD hechas por el querellante el 27 de octubre de 2021, el Departamento de QC de la Compañía también evaluó los equipos en el laboratorio, la balanza, los materiales utilizados y el ambiente en el laboratorio, incluyendo la temperatura, y determinó que todos los factores estaban de acuerdo con lo requerido, por lo que se concluyó que los resultados atípicos no eran producto de fallas en dichos equipos ni en el ambiente del laboratorio. **Anejo 1**, *Declaración Jurada de Chayla Meléndez*, ¶ 34; **Exhibit 8 del Anejo 3**, *Laboratory Investigation Report 200922.*

52. Como parte de la investigación, en noviembre de 2021, Patheon también realizó pruebas adicionales de LOD a los mismos lotes que trabajó el querellante el 27 de octubre para determinar la posible causa de que las muestras absorbieran

humedad y ganaran peso y, por tanto, de los resultados atípicos. No obstante, las pruebas de LOD realizadas por la Compañía en noviembre de 2021 no demostraron aumento de peso en la prueba y arrojaron resultados dentro de los parámetros establecidos. **Anejo 1**, *Declaración Jurada de Chayla Meléndez, ¶* 35; **Exhibit 8 del Anejo 3**, *Laboratory Investigation Report 200922.*

53. Ante el hecho de que las evaluaciones hechas hasta el 12 de noviembre no habían arrojado una explicación para los resultados atípicos de las pruebas realizadas por el querellante, el 12 de noviembre de 2021, el Departamento de QC, solicitó y obtuvo acceso al video de la cámara de seguridad ubicada en el laboratorio donde se realizó la prueba para determinar los pasos que realizó el querellante el 27 de octubre de 2021. El video de seguridad demostró lo siguiente:

> *The scientist (00216798) was observed executing the testing not following the method (process) and adding elements not required for the testing. These actions represent a Data Integrity deviation, a new DR (210993) was generated to investigate this evidence founded. This DR was classified as a critical deviation where the conduct of the Scientist performing the test was identified as potentially fraudulent result.*

**Anejo 1**, *Declaración Jurada de Chayla Meléndez, ¶* 36; **Exhibit 8 del Anejo 1**, *Memorando sobre Investigación de Integridad de Datos, a la pág. 1.*

54. Del video obtenido por la Compañía se observó y concluyó que el querellante ese 27 de octubre de 2021, realizó lo siguiente:

> During the step 4.5.2.6 (Then re-weigh the cooled weighing dish with the lid) the QC Scientist (00216798) was observed introducing small pieces of something that looks like delicate task wipers (Kimwipers) in the balance (Bal 27) this was done during the weighing of the lots MT1T052900, MT1T052910 and MT1T052920.

**Anejo 1**, *Declaración Jurada de Chayla Meléndez, ¶* 37; **Exhibit 8 del Anejo 1**, *Memorando sobre Investigación de Integridad de Datos, a la pág. 2.*

55. Debido a que del video del laboratorio surgía que el querellante no realizó las pruebas de acuerdo con el método MFG-061, contrario a lo que el querellante había indicado el 28 de octubre de 2021, el Departamento de QC refirió el asunto al Departamento de Recursos Humanos para la acción correctiva correspondiente. A raíz de dicha notificación, el Departamento de Recursos Humanos comenzó su investigación sobre el asunto, pero desde la perspectiva disciplinaria. **Anejo 1**, *Declaración Jurada de Chayla Meléndez, ¶* 38; **Exhibit 8 del Anejo 3**, *Laboratory Investigation Report 200922*; **Exhibit 8 del Anejo 1**, *Memorando sobre Investigación de Integridad de Datos.*

56. Conforme a los hallazgos de la investigación realizada por el Departamento de Recursos Humanos, las actuaciones del querellante, según surgen del video de la cámara de seguridad, representaron las siguientes violaciones:

Violations observed during the video:

1. Procedure M700-061 R.29 – Good Laboratory Practices requires in section V step 2, QC Scientists prepare all laboratory samples as indicated in the corresponding analytical method, taking all the necessary precautions established to maintain the sample integrity and to prevent sample loss.
2. Procedure M700-035 Operation of Laboratory Balances – in section A, which indicates QC Scientist has to verify the balance is clean and in good conditions previous use the balance.
3. Execution Method MFG-061 Rev 03 (Effective Date: 22-Oct-2021) "Empagliflozin / Metformin HCI Film Coated Tablets" Section 4.5 step 4.5.2.6 (Then re-weigh the cooled weighing dish with the lid).
4. Procedure M700-20 R.27, Receiving, Storage, Handling and Testing in the QC Analytical and Microbiology Laboratories, which indicates in section C step 2, QC Scientist must take special care handling the samples during laboratory analyses and notify the Supervisor if any abnormal condition is detected.
5. Procedure SOP C800-031Good manufacturing practice Rev._ which indicates in section V. A. step1 – it is a requirement of all personnel to maintain and report data that is accurate, complete, truthful....
6. Data integrity principles of accurate and a potential effect on a patient safety, product quality and data reliability.

**Anejo 1**, *Declaración Jurada de Chayla Meléndez, ¶ 40;* **Exhibit 8 del Anejo 1**, *Memorando sobre Investigación de Integridad de Datos, a la pág. 2.*

57. Del video de seguridad también se concluyó que el querellante violentó el método MFG-061, al introducir kimwipes mientras se pesaba la muestra como parte de la prueba de LOD. **Anejo 1**, *Declaración Jurada de Chayla Meléndez, ¶ 41.*

58. El 12 de noviembre de 2021, como medida de seguridad en lo que se culminaba la investigación, Patheon colocó en cuarentena los tres (3) lotes relacionados a las pruebas que realizó el querellante el 27 de octubre de 2021, ante los resultados atípicos. **Anejo 1**, *Declaración Jurada de Chayla Melendez, ¶ 42;* **Exhibit 8 del Anejo 3**, *Laboratory Investigation Report 200922.*

59. Como parte de las investigaciones del Departamento de QC y del Departamento Recursos Humanos, el 15 de noviembre de 2021 se citó al querellante a una reunión con Jayson Llavona, QC Sr. Manager, William Rosario, QC Manager, Sáez, QC Supervisor, Marlicel Peña, ("Peña") de Recursos Humanos, y Javier Rivera ("Rivera"), Oficial de "Data Integrity". Durante la reunión, el querellante completó un documento titulado "Employee Concerns", en el que pudo escribir todo lo que quiso y sobre el proceso de las pruebas realizadas el 27 de octubre de 2021. **Anejo 2**, *Deposición de Alexis Nieves Viera*, pág. 113, l. 23 a la pág. 117, l. 12 y pág. 128, l. 23 a la pág. 129, l. 2; **Exhibit 7 del Anejo 3**, *Employee Concerns completado el 15 de noviembre de 2021*; **Anejo 1**, *Declaración Jurada de Chayla Meléndez, ¶ 44.* Patheon también le mostró un video en un celular al querellante para

que explicara lo que ocurría en el video obtenido de la cámara del laboratorio. **Anejo 2**, *Deposición de Alexis Nieves Viera*, pág. 40, l. 17-25; pág. 44, l. 12 a la pág. 52, l. 21.

60. En la reunión del 15 de noviembre de 2021, el querellante brindó distintas versiones sobre el proceso realizado el 27 de octubre de 2021, las cuales no coincidían con lo que surgía del video de la cámara de seguridad del área. A esos efectos, durante la reunión del 15 de noviembre de 2021, ocurrió lo siguiente:

> The Site Quality Head, Jayson Llavona proceeded to show him the video available. After sharing the video, he was asked to explain why his version is different from the video. The colleague then changed his version of the event. He alleged that during the weighing process after he placed the sample in the balance pan, he noticed a drop of liquid. He explained is required to clean before the testing, he admitted he did it during testing process multiple times and without the globes. He alleged he had to do it in 3 times, but it was observed in the video more occasions during the testing's process. He was observed doing a movement from left to right with the right thumb of his finger. He said the reference movement was to clean the balance. He did not provide any explanation for not use the globes as required. We asked questions to get understanding of his motivations. He was not able to provide more information. The employee denied doing anything else than cleaning the drop.

**Anejo 1**, *Declaración Jurada de Chayla Meléndez*, ¶ 46; **Exhibit 8 del Anejo 1**, *Memorando sobre Investigación de Integridad de Datos*, a la pág. 2; **Anejo 2**, *Deposición de Alexis Nieves Viera*, pág. 40, l. 17-25; pág. 44, l. 12 a la pág. 52, l. 21.

61. Según surge de los hallazgos de la Investigación de Recursos Humanos, la entrevista del querellante demostró las siguientes violaciones adicionales incurridas por éste:

Violations based on his allegations after he saw the video:
1. Procedure M700-035 Operation of Laboratory Balances – which indicates requirement to clean the balance how the QC Scientist performs the cleaning process. This is not allowing to have samples while cleaning process.
2. Procedure M700-070, Laboratory Safety Program. Section B - Performed testing without appropriated globes, which is part of his personal protective equipment.
3. The SOP C800-031, Good Manufacturing Practices was not followed in the sections described below:
   - Section V.A. step 6 – Any employee documenting fraudulent data entries, deliberately concealed or destroy data, submit false statements of material facts or committed any other deliberate wrongful acts are subject to immediate disciplinary action up to and including termination.

**Anejo 1**, *Declaración Jurada de Chayla Meléndez*, ¶ 47; **Exhibit 8 del Anejo 1**, *Memorando sobre Investigación de Integridad de Datos*, a la pág. 2.

62. En la investigación de Recursos Humanos también se concluyó que el querellante proveyó versiones inconsistentes sobre el procedimiento que llevó a cabo el 27 de octubre de 2021, al hacer las pruebas de LOD, y que éste mintió durante el proceso de investigación de la Compañía. **Anejo 1**, *Declaración Jurada de Chayla Meléndez*, ¶ 48; **Exhibit 8 del Anejo 1**, *Memorando sobre Investigación de Integridad de Datos.*

[…]

65. El 16 de noviembre de 2021, Rivera rindió un Memorando sobre la investigación DR 210993 y recomendó separar al querellante de sus labores. […]

**Anejo 1**, *Declaración Jurada de Chayla Meléndez*, ¶ 50; **Exhibit 9 del Anejo 3**, *Memorandum Data Integrity Event - DR 200922, a las págs. 2-3.*

66. Desde el 22 de noviembre de 2021, Patheon gestionó la solicitud interna para la terminación de Nieves, debido al patrón de violaciones graves de los procedimientos de la Compañía, incluyendo el mentir durante el proceso investigativo y las faltas graves a la integridad de datos. **Anejo 1**, *Declaración Jurada de Chayla Meléndez*, ¶ 51; **Exhibit 9 del Anejo 1**, *Request to Terminate Employment for Performance or Cause del 22 de noviembre de 2021.*

67. El 2 y 3 de diciembre de 2021, Patheon repitió las pruebas realizadas por el querellante, en dos ocasiones separadas, y en ambas instancias los resultados arrojaron valores dentro de los parámetros establecidos. A esos efectos, las pruebas de "Repeat Test Protocol" arrojaron los siguientes resultados:

Table # 2: Repeat test Results.

| Sample lot | Original Results % | Repeat test Results % |
|---|---|---|
| MT1T052900 | 0.0 | 0.5 |
| MT1T052910 | -0.1 | 0.7 |
| MT1T052920 | 0.0 | 0.8 |

**Anejo 1**, *Declaración Jurada de Chayla Meléndez*, ¶ 53; **Exhibit 8 del Anejo 3**, *Laboratory Investigation Report 200922, a la pág. 6.*

68. El 6 de diciembre de 2021, Patheon llamó al querellante para citarlo para una tercera reunión en Recursos Humanos como parte de la investigación de las desviaciones sobre el LOD, pero el querellante no asistió. **Anejo 2**, Deposición de Alexis Nieves Viera, pág. 144, l. 6 a la pág. 145, l. 9. En esa misma fecha, el querellante asistió a la Unidad Antidiscrimen y completó un cargo. **Anejo 2**, *Deposición de Alexis Nieves Viera,* pág. 197, l. 11 a la pág. 198, l. 25; **Anejo 9**, *Cargo Unidad Antidiscrimen.*

[…]

70. El 13 de mayo de 2022, Sylda Roldán, Gerente de Recursos Humanos para dicha fecha, Meléndez, y Alexander Rivera (en adelante, "Rivera"), del área de Seguridad, se reunieron con el querellante y le mostraron nuevamente el video del 27 de octubre de 2021 en la computadora. **Anejo 2**, *Deposición de Alexis Nieves Viera,* pág. 40, l. 17-25; pág. 44, l. 12 a la pág. 52, l. 21; pág. 134, l. 19 a la pág. 136, l. 9. Durante la reunión del 13 de mayo de 2022, Patheon le preguntó al querellante sobre las pruebas de LOD que realizó

el 27 de octubre de 2021. **Exhibit 10 de Anejo 1**, *Confirmación de Entrevista del 13 de mayo de 2022*; **Anejo 11**, Human Resources Inve[s]tigation Report; **Anejo 1**, *Declaración Jurada de Chayla Meléndez*, ¶ 55. El querellante firmó un documento titulado "Confirmación de Entrevista" sobre lo discutido durante la reunión del 13 de mayo de 2022. **Anejo 2,** *Deposición de Alexis Nieves Viera*, pág. 134, l 25 a la pág. 136, l. 19. **Anejo 2**, *Deposición de Alexis Nieves Viera*, pág. 88, l. 12 a la pág. 91, l. 6; **Exhibit 10 de Anejo 1**, *Confirmación de Entrevista del 13 de mayo de 2022.*

71. Luego de entrevistar al querellante el 13 de mayo de 2022, Patheon reconfirmó los hallazgos de su investigación, en cuanto al patrón de violaciones graves en que incurrió el querellante, y concluyó que éste no había cumplido con los procesos establecidos por la Compañía, incluyendo el de integridad de datos, y mintió, al proveer versiones en conflicto sobre el proceso llevado a cabo por éste el 27 de octubre de 2021, por lo que procedía el despido. **Anejo 11**, *Human Resources Investigation Report*; **Anejo 1**, *Declaración Jurada de Chayla Meléndez*, ¶ 56.

Inconforme, el 9 de noviembre de 2023, Patheon acudió ante este Foro mediante recurso de *Certiorari* y señaló al TPI la comisión de los siguientes errores:

A. ERRÓ EL TPI AL DETERMINAR QUE EXISTE CONTROVERSIA SOBRE LOS HECHOS MATERIALES PROPUESTOS POR PATHEON.

B. ERRÓ EL TPI AL DENEGAR LA SUMARIA DE PATHEON Y NO DESESTIMAR LA CAUSA DE ACCIÓN POR ALEGADO DESPIDO INJUSTIFICADO.

C. ERRÓ EL TPI AL DENEGAR LA SUMARIA DE PATHEON Y NO DESESTIMAR LA CAUSA DE ACCIÓN POR ALEGADAS REPRESALIAS.

El 10 de noviembre de 2023, el señor Nieves Viera compareció mediante *Moción de Desestimación bajo la R. 83 (B)(1) del Reglamento del Tribunal de Apelaciones*. El 30 de noviembre de 2023, emitimos una *Resolución* en la cual declaramos No Ha Lugar la moción de desestimación y concedimos un término al recurrido para presentar su posición. El 8 de enero de 2024, el señor Nieves Viera presentó *Oposición del querellante-recurrido a petición de Certiorari*.

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

## II.

### -A-

El auto de *certiorari* constituye un vehículo procesal discrecional que permite a un tribunal de mayor jerarquía revisar las determinaciones de un tribunal inferior[7]. La determinación de expedir o denegar este tipo de recursos se encuentra enmarcada dentro de la discreción judicial[8]. De ordinario, la discreción consiste en "una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera"[9]. Empero, el ejercicio de la discreción concedida "no implica la potestad de actuar arbitrariamente, en una u otra forma, haciendo abstracción del resto del derecho"[10].

Ahora bien, en los procesos civiles, la expedición de un auto de *certiorari* se encuentra delimitada a las instancias y excepciones contenidas en la Regla 52.1 de Procedimiento Civil[11]. La mencionada Regla dispone que solo se expedirá un recurso de *certiorari* cuando "se recurra de una resolución u orden bajo las Reglas 56 y 57 o de la denegatoria de una moción de carácter dispositivo"[12]. Asimismo, y a manera de excepción, se podrá expedir este auto discrecional en las siguientes instancias:

> [C]uando se recurra de decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales, asuntos relativos a privilegios evidenciarios, anotaciones de rebeldía, en casos de relaciones de familia, en casos que revistan interés público o en cualquier otra situación en la cual esperar a la apelación constituiría un fracaso irremediable de la justicia[13].

En consecuencia, las determinaciones que cumplan con la Regla 52.1 de las de Procedimiento Civil, *supra*, pueden ser objeto

---

[7] Véase *Torres González v. Zaragoza Meléndez*, 211 DPR 821 (2023); *800 Ponce de León v. AIG*, 205 DPR 163, 174 (2020); *IG Builders et al. v. BBVAPR*, 185 DPR 307, 337-338 (2012); *García v. Padró*, 165 DPR 324, 334-335 (2005).
[8] *Íd.*
[9] *Mun. de Caguas v. JRO Construction*, 201 DPR 703, 712-713 (2019).
[10] *Medina Nazario v. McNeil Healthcare LLC*, 194 DPR 723, 729 (2014); *Negrón v. Srio. De Justicia*, 154 DPR 79, 91 (2001).
[11] 32 LPRA Ap. V, R. 52.1.
[12] *800 Ponce de León v. AIG, supra*, pág. 175.
[13] *Íd.*

de revisión y el tribunal apelativo ejercerá su discreción para decidir si expide o no el recurso de *certiorari*. Los criterios que este Tribunal de Apelaciones examina para ejercer su discreción se encuentran recogidos en la Regla 40 de nuestro Reglamento[14]. Esta norma procesal dispone lo siguiente:

> El tribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de *certiorari* o de una orden de mostrar causa:
>
> (A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.
>
> (B) Si la situación de hechos planteada es la más indicada para el análisis del problema.
>
> (C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.
>
> (D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.
>
> (E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.
>
> (F) Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.
>
> (G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

Por lo tanto, para ejercer debidamente nuestra facultad revisora es menester evaluar si, a la luz de los criterios antes enumerados, se justifica nuestra intervención, pues distinto al recurso de apelación, este tribunal posee discreción para expedir el auto de *certiorari*[15]. Por supuesto, esta discreción no opera en el vacío y en ausencia de parámetros que la dirijan[16]. Precisa recordar que la discreción ha sido definida como "una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera[17]".

---

[14] 4 LPRA XXII-B, R. 40.

[15] *Feliberty v. Soc. de Gananciales*, 147 DPR 834, 837 (1999).

[16] *IG Builders et al. v. BBVAPR, supra*; *Rivera Figueroa v. Joe's European Shop*, 183 DPR 580 (2011).

[17] *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 434-435 (2013).

**-B-**

El Tribunal Supremo de Puerto Rico ha expresado en varias ocasiones que la sentencia sumaria es un remedio extraordinario y discrecional que sólo se debe conceder cuando no existe una controversia genuina de hechos materiales y lo que resta es aplicar el derecho[18]. En términos generales, al dictar sentencia sumaria el tribunal deberá hacer lo siguiente:

> (1) analizar los documentos que acompañan la solicitud de sentencia sumaria y los que se incluyen con la moción en oposición, así como aquellos que obren en el expediente del tribunal;
>
> (2) determinar si el oponente de la moción controvirtió algún hecho material y esencial, o si hay alegaciones de la demanda que no han sido controvertidas o refutadas en forma alguna por los documentos[19].

Analizados estos criterios, el tribunal no dictará sentencia sumaria cuando existan hechos materiales y esenciales controvertidos; cuando haya alegaciones afirmativas en la demanda que no han sido refutadas; cuando surja de los propios documentos que acompañan la moción una controversia real sobre algún hecho material y esencial, o cuando como cuestión de derecho, no procede[20]. La sentencia sumaria se puede dictar a favor o en contra de la parte que la solicita, según proceda en Derecho[21].

Por tratarse de un remedio discrecional, el uso del mecanismo de sentencia sumaria tiene que ser mesurado y solo procederá cuando el tribunal quede claramente convencido de que tiene ante sí documentos no controvertidos[22]. Es importante mencionar, que este Tribunal utilizará los mismos criterios que el Tribunal de Primera Instancia al determinar si procede una moción de sentencia sumaria[23].

---

[18] *Maldonado v. Cruz.*, 161 DPR 1, 39 (2004).
[19] *Vera v. Dr. Bravo*, 161 DPR 308, 334 (2004).
[20] *Íd.*, págs. 333-334.
[21] *Maldonado v. Cruz, supra.*
[22] *Íd.*, pág. 334.
[23] *Íd.*

Los criterios que este foro intermedio debe tener presentes al atender la revisión de una sentencia sumaria son los siguientes:

1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra,* y la jurisprudencia le exigen al foro primario;

2) revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36, *supra;*

3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos;

4) y de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia[24].

Además, al revisar la determinación del TPI respecto a una sentencia sumaria, estamos limitados de dos maneras; (1) solo podemos considerar los documentos que se presentaron ante el foro de primera instancia, (2) solo podemos determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y si el derecho se aplicó de forma correcta[25]. El primer punto se enfoca en que las partes que recurren a un foro apelativo no pueden litigar asuntos que no fueron traídos a la atención del foro de instancia. Mientras que el segundo limita la facultad del foro apelativo a revisar si en el caso ante su consideración existen controversias reales en cuanto a los hechos materiales, pero no puede adjudicarlos[26]. También, se ha aclarado que al foro apelativo le es vedado adjudicar los hechos materiales esenciales en disputa, porque dicha tarea le corresponde al foro de primera instancia[27].

---

[24] *Roldan Flores v. M Cuebas,* 199 DPR 664, 679 (2018).
[25] *Meléndez González, et al. v. M. Cuebas,* 193 DPR 100 (2015).
[26] *Íd.,* pág. 115.
[27] *Vera v. Dr. Bravo, supra,* pág. 335.

**III.**

En el presente caso, Patheon señala que erró el TPI al declarar No Ha Lugar su *Moción de Sentencia Sumaria* presentada el 30 de mayo de 2023. En síntesis, alega que "posee una razón justificada, no discriminatoria ni represiva, para el despido del [señor Nieves Viera], las causas de acción de la *Querella* son improcedentes como cuestión de derecho. Por tanto, procede que este Honorable Tribunal dicte Sentencia al amparo de la Regla 36 y desestime la totalidad de la *Querella,* con perjuicio"[28].

Por su parte, el señor Nieves Viera aduce que todos los hechos materiales están en controversia, lo que impide que se dicte sentencia sumariamente en el presente caso[29]. En particular, sostuvo que de su testimonio en la deposición surge que en ningún momento alteró los resultados de una prueba para que la misma arrojara resultados atípicos, razón por la cual alega fue despedido de manera injustificada[30].

Como mencionamos anteriormente, en la *Orden* recurrida el TPI declaró No Ha Lugar la *Moción de Sentencia Sumaria* presentada por Patheon. Particularmente, concluyó que no existe controversia sobre los siguientes hechos materiales, a saber: 1-30, 35-37, 39, 42, 63, 64, 69 y 72-82. Asimismo, el TPI determinó que existía controversia sobre los hechos materiales previamente esbozados en el acápite I.

Tras una revisión cuidadosa del expediente ante nuestra consideración, determinamos que la *Moción de Sentencia Sumaria*[31] presentada por Patheon, así como la *Oposición del Querellante a la relación concisa y organizada de hechos materiales que no están en controversia de la Moción de Sentencia Sumaria*[32] presentada por el

---

[28] Apéndice del recurso, pág. 69.
[29] Apéndice del recurso, págs. 944.
[30] *Íd.*
[31] Apéndice del recurso, pág. 21-927.
[32] Apéndice del recurso, págs. 943-1025.

señor Nieves Viera, cumplen con los requisitos de la Regla 36.3 de Procedimiento Civil[33].

No obstante lo anterior, del expediente apelativo se desprende que el caso de epígrafe es uno tramitado bajo la Ley Núm. 2-1961, *supra,* en el que Patheon recurre de la denegatoria de una moción de carácter dispositivo, la cual es revisable, por vía de excepción, según lo dispuesto por el Tribunal Supremo en el caso *Dávila, Rivera v. Antilles Shipping, Inc.*, el cual establece lo siguiente:

> Así, pues, *concluimos que, con el objetivo de salvaguardar la intención legislativa, autolimitamos nuestra facultad revisora, y la del [Tribunal de Apelaciones], en aquellos casos de resoluciones interlocutorias dictadas al amparo de la citada Ley Núm. 2 con excepción de aquellos supuestos en que la misma se haya dictado sin jurisdicción por el tribunal de instancia y en aquellos casos extremos en los cuales los fines de la justicia requieran la intervención del foro apelativo;* esto es, en aquellos casos extremos en que la revisión inmediata, en esa etapa, disponga del caso, o su pronta disposición, en forma definitiva o cuando dicha revisión inmediata tenga el efecto de evitar una "grave injusticia" *(*miscariage of justice*)*[34].

Al analizar los hechos del caso de marras a la luz de la doctrina antes expuesta, forzoso es concluir que la *Orden* de la cual se recurre fue dictada con jurisdicción y el hecho de que este foro revisor no intervenga no le causará a las partes una grave injusticia, pues el TPI está en mejor posición para evaluar, aquilatar y dirimir las controversias, así como recibir y apreciar toda la prueba.

Por lo tanto, de acuerdo con lo antes expuesto, sostenemos que no están presente ninguna de las excepciones a la limitación para revisar asuntos interlocutorios bajo la Ley Núm. 2, *supra.* Consecuentemente, entendemos que procede denegar la expedición del auto de *Certiorari* solicitado.

**IV.**

Por los fundamentos que anteceden, **denegamos** la expedición del auto de *Certiorari* solicitado.

---

[33] 32 LPRA AP. V, R. 36.3.
[34] *Dávila, Rivera v. Antilles Shipping, Inc.*, 147 DPR 483, 498 (1999).

**Notifíquese inmediatamente**.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones